IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ANSHUMAN CHANDRA, and<br>JULIAN M. KNIGHT, | ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | |
| | ) | **Case No. 19-cv-11739** |
| v. | ) <br> ) | |
| STANDARD CHARTERED BANK,<br>STANDARD CHARTERED BANK, DUBAI,<br>and STANDARD CHARTERED BANK,<br>NEW YORK, | ) <br> ) <br> ) <br> ) | **COMPLAINT** |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## NATURE OF THE CASE

1.      This case is brought pursuant to Federal and New York law to remedy the retaliation that Defendants, Standard Chartered Bank ("SCB UK"), Standard Chartered Bank, Dubai ("SCB Dubai") and Standard Chartered Bank, New York ("SCB NY"), branches of Standard Chartered Bank, PLC (collectively, "SCB"), a massive international bank with approximately $637 billion in assets, have taken against Plaintiffs, Mr. Anshuman Chandra and Mr. Julian Knight, for their efforts to expose the hugely profitable scheme, executed primarily by Defendants, to violate the sanctions imposed by the United States to halt a wide range of transactions benefiting Iran in what is effectively the international reserve currency, the U.S. dollar.

2.      Because Iran's currency, the rial, is one of the world's least valued currencies, Iran depends on access to U.S. dollars to generate its main source of revenue, from international sales of oil and gas, and so to fuel its efforts to acquire weapons of mass destruction and to buy the increasingly sophisticated weaponry relied upon by its terrorist proxies. In the context of that

harsh reality, the U.S. sanctions are the most aggressive and effective blow that can be delivered to Iran short of military action.

3.     A corollary to that logic is that Iran, its various agents, and others in league with Iran are willing to pay a high premium to convert rials or otherwise get access to U.S. dollars.

4.     And a final corollary to that logic is that Defendants have maneuvered to acquire that extraordinarily lucrative business of becoming a kind of third-party central bank for Iran, giving Iran access to the U.S. dollars it so desperately needs while collecting the premium Iran and its supporters are so willing to pay.

5.     Defendants have pursued what amounts to a highly sophisticated money laundering scheme on behalf of Iran, have executed tens of billions of dollars of illegal transactions benefiting Iran and its terrorist interests while concealing those transactions from scrutiny, and their reward – truly blood money – has been hundreds of millions of dollars in profit.

6.     To protect such an extraordinary flow of profit, Defendants and SCB have manipulated with great skill the regulatory system supposedly enforcing the Iran sanctions, cleverly playing off that system's reliance on "self-reporting" by financial institutions and the limited resources available to the federal officials charged with sanctions enforcement.

7.     Thus, in January 2010, SCB self-reported to federal and state regulators Defendants' violations of the Iran sanctions at amounts exponentially lower than the actual numbers, and went on to make false representations that their illegal conduct had stopped, with an additional caveat, that they had only halted the acquisition of *new* sanctions-violating business. SCB claimed Defendants continued to engage in what it portrayed as appropriate "winding down" transactions of existing obligations. But there is no legal exception from the

constraints of the Iran sanctions for such transactions – SCB certainly cited no authority – and continuing to execute tens of billions of dollars of transactions clearing U.S. dollars on behalf of Iranian interests is obviously at war with the whole point of the Iran sanctions regime.

8.      Defendants and SCB have effectively duped the federal regulatory establishment through factual and legal sleight-of-hand. In 2012 and 2019, federal regulators settled with SCB for the forfeiture of amounts far below the billions of dollars in illegal transactions in which Defendants had engaged, all of which had already been forfeited to the United States by operation of law.

9.      Plaintiffs posed a special threat to Defendants' Iranian gravy train because, with inside knowledge of Defendants' conduct, they uniquely jeopardized Defendants' corrupt scheme.  In 2011, when Mr. Knight, as Global Head of Transaction Banking Foreign Exchange Sales for SCB Dubai and SCB Singapore, reported what he thought were serious, but inadvertant, holes in the Defendants' protocols and procedures to catch and obstruct money laundering (including, most prominently, efforts to circumvent the Iran sanctions), and proposed changes to plug those holes, he was ultimately advised that his career at SCB was at an end.  He moved on to work at other international financial institutions.

10.      The crisis point came in 2012, when Mr. Knight and his colleague, Robert Marcellus, became aware that government authorities were investigating SCB for violations of the Iran sanctions because of SCB's very limited self-disclosure. They approached Federal and New York State financial regulators with the inside information they possessed that showed that the scope and methods of Defendants' Iranian money laundering operation far exceeded what the regulators had been lead to believe by SCB.

11.    Mr. Knight and Mr. Marcellus, at the recommendation of the New York authorities, organized and formalized the presentation of their information in a lawsuit they brought under the Federal False Claims Acts. Because of fear of reprisals from the Defendants, the plaintiff in the case was Brutus Trading, LLC, an entity they created to shield their identities.

12.    Mr. Chandra had been concerned since July 2012 about access to SCB's trading platform by customers who were suspected of funding terrorist organizations. After contacting Mr. Knight in May 2013 and offering to provide him with SCB records of dealings with customers linked to Iran, he transmitted information about SCB to a Dubai-based colleague of Plaintiffs to then be submitted to the joint investigation of SCB. From May 2013 through December 2016, he provided to the investigation voluminous SCB records of its transactions with Iran-related customers.

13.    Defendants retaliated aggressively by terminating the Plaintiffs without reasonable cause, discrediting them and destroying their careers in the industry, withholding promised benefits to Mr. Chandra, and discriminating in their treatment of the Plaintiffs, and otherwise threatening them and their families.

14.    The Federal False Claims Act relies on the willingness of whistleblowers to step forward to aid the effort to combat the extraordinary variety of fraud against the Government. Retaliation against whistleblowers by the perpetrators of that fraud is at war with the operation of these statutory regimes to protect the public fisc. In this case, Mr. Chandra and Mr. Knight claim the benefits of the provisions of these statutes designed to protect whistleblowers from such retaliation, and to empower whistleblowers to strike back at the perpetrators when retaliation does occur.

### PARTIES

**Anshuman Chandra**

15.     Plaintiff Anshuman Chandra is a citizen and resident of India.

16.     Between 1995 and 1998, Mr. Chandra studied at the prestigious National Defence Academy, the joint services academy of the Indian Armed Forces. He decided not to pursue a commission in the Indian Army, but instead in 2001 received his BA in economics from Chaudhary Charan Singh University. He received his post-graduate certification in Business Administration, Accounting and Business/Management from Bradford University School of Management in the United Kingdom and a professional certificate in Renewable Energy and Clean Power from Imperial College London.

17.     Before his employment by SCB in August 2011, Mr. Chandra served as an assistant manager with Jukaso Hotels Palaces & Resorts (1999-2000); Aviation Security Agent, British Airways (2000-2002); Business Analyst, American Express (2002-2004); and Customer Service & Operations Executive in India (2004-2007), and Customer Service & Operations Manager in Dubai for British Airways (2007-2011), which awarded him for outstanding performance in 2011.

18.     Mr. Chandra was SCB's head of eCommerce Client Services, Financial Markets, for the Middle East, South Asia, Africa regions and operated out of SCB Dubai.

**Julian M. Knight**

19.     Plaintiff Julian M. Knight is a citizen of the United Kingdom and currently resides there.

20.     In 1991, Mr. Knight received a bachelor of science degree with Joint Honours from the University of Durham in Physics and Chemistry of Materials. He received an MA, with

Honours, in International Relations from the University of Nottingham in 1994. He is a Fellow

of the Royal Society for Arts and Sciences in Environmental Science.

       21.      From September 1988 to October 1994, Mr. Knight served in the Royal Air

Force, attaining the rank of Flight Lieutenant with Squadron Leader seniority. From November

1994 through 2011 he served as a Commissioned Officer in the Royal Air Force Reserve.

       22.      Before his employment at SCB in April 2008, Mr. Knight served as a foreign

exchange trader in London for NM Rothschild & Sons Ltd. (1995), and at Fimat International

Banque, UK, as a Senior Foreign Exchange Trader and Global Head of Foreign Exchange (1996-

2004) and as Global Head of Foreign Exchange, managing sales trading teams in Singapore,

London, New York, and Chicago (2001-2003).

       23.      From September 2000 through November 2006, Mr. Knight served as a member

of the Advisory Board of the Financial Exchange Division of the New York Board of Trade. He

remains the youngest person to have held that position.

       24.      Mr. Knight served as the Global Head of Foreign Exchange Distribution at the

Man Group, PLC, a global fund and investment manager (2004-2006), and as Chairman and

CEO of Global Cool Productions, a wholly-owned subsidiary of the Man Group designed to

combat climate change through public outreach and consultancies to advise individuals and

businesses on how to reduce their carbon footprint. Many figures from the political and arts

worlds in the United Kingdom and the United States were actively involved in the campaign,

including Prince Charles, Tony Blair, David Cameron, Leonardo di Caprio, Orlando Bloom,

Kate Bosworth, and Sienna Miller. As part of the Global Cool campaign, Mr. Knight made many

appearances on worldwide TV and radio.

25.     In April 2008, Mr. Knight was hired by the Chairman of SCB, Lord Mervyn
Davies, as a consultant to the Head of Wholesale Bank Strategy, in Singapore, to write a policy
for the bank concerning the impact of SCB's entire footprint on water resources and on private
equity fund investments in water infrastructure. Mr. Knight raised assets for this fund from
sovereign wealth funds in SCB's Asian and Middle East/North Africa ("MENA") regions.

26.     From July 2008 to December 2008, Mr. Knight was the Director of Hedge Fund
Sales at SCB Singapore. In January 2009, he became Head of MENA Central Bank/Sovereign
Wealth Fund Sales, working from Dubai and Abu Dhabi. He was responsible for all financial
markets sales to MENA sovereign wealth funds, central banks, and ministries of finance.

27.     In October 2009, Mr. Knight became Global Head of Transaction Banking
Foreign Exchange Sales, until he was forced out of SCB in November 2011.

**The Defendants**

28.     Standard Chartered Bank ("SCB UK") is a public limited liability company
incorporated in England, with offices in London, and is the headquarters of Standard Chartered
PLC, a bank holding company and leading international banking institution. SCB is an indirect
subsidiary of Standard Chartered PLC.

29.     Defendant Standard Chartered Bank, Dubai ("SCB Dubai") is the Dubai branch of
Standard Chartered PLC.  SCB Dubai was incorporated in the UAE in 1958.  SCB Dubai
provides international banking and financial services from two offices in Dubai.

30.     Standard Chartered Bank, New York ("SCB NY") is the New York branch of
Standard Chartered PLC. SCB NY has been licensed by the New York Department of Financial
Services ("DFS") to operate a foreign bank branch in New York State since 1976. SCB NY

provides international banking and financial services from its office at 1095 Avenue of the Americas, New York, NY 10036.

## JURISDICTION AND VENUE

31.     This Court has personal jurisdiction over Defendant SCB NY pursuant to 31 U.S.C. § 3732(a) because it can be found, resides, and transacts business in the Southern District of New York.  This Court also has personal jurisdiction over Defendant SCB Dubai under Federal Rule of Civil Procedure 4(k)(1)(a) and New York's long-arm statute, N.Y.C.P.L.R. § 302(a)(1), because it transacts business within New York, including the clearing and settlement through SCB New York each business day of approximately $250 million in international transactions and regular meetings of officers of SCB Dubai in New York with their colleagues from SCB New York.

32.     The Court has general federal question subject matter jurisdiction over Mr. Chandra's claim under the False Claims Act, 31 U.S.C. § 3730(h), pursuant to 28 U.S.C. § 1331. The Court has subject matter jurisdiction over Mr. Chandra's and Mr. Knight's claims under N.Y. STATE FIN. § 191 pursuant to 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds $75,000 and is between citizens of a State and citizens of a foreign state who are not admitted for permanent residence in the United States and are not domiciled in that State. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Mr. Chandra's and Mr. Knight's state law claims because those claims, which share a common nucleus of operative facts with the False Claims Act retaliation claim, form part of the same case or controversy as the False Claims Act retaliation claim.

33.     Venue is proper in the Southern District of New York, under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a), because at least one Defendant can be found, resides and transacts business in this District.

## GENERAL ALLEGATIONS

**A.     The Defendants' Scheme to Violate the Iran Sanctions.**

34.     Sanctions imposed by the United States on the Government of Iran and those dealing with Iranian parties have been a significant component of U.S.-Iran policy for decades, beginning in 1979 following the seizure of the U.S. Embassy in Tehran. Through numerous statutes, executive orders and regulations, the United States has applied pressure on Iran to cease its support for terrorist organizations and its development of nuclear weapons. Key among those sanctions was a restriction on Iran's access to the U.S. financial system. Because the U.S. dollar is the world's reserve currency and enjoys a dominant role in foreign exchange and international transactions, U.S. sanctions have had a major impact on Iran's economy. As a consequence of the U.S. financial sanctions, foreign banks and other parties transacting business with Iran-related parties are generally unable to acquire U.S. dollars for those transactions.

35.     U.S. statutes and regulations block all transactions involving the U.S. dollar by financial institutions with any individual or entity linked to the Government of Iran.

36.     All international transactions involving the U.S. dollar require clearing by the Federal Reserve Bank in New York.

37.     If a U.S. dollar transaction violates the U.S. sanctions regulatory scheme, it is blocked by the Federal Reserve Bank.

38.     SCB adopted a multi-faceted scheme to evade the U.S. sanctions on Iran-related transactions and to conceal its dealings with parties subject to those sanctions.

a) It utilized accounts described as sundry accounts to conceal the identity of the actual counterparty making the trade by inserting the name of an SCB branch bank. This enabled SCB to process U.S. dollar transactions for parties subject to U.S. sanctions without those transactions being blocked by the Federal Reserve Bank.

b) In a variation of the sundry account scheme, SCB altered names of parties subject to U.S. sanctions in order to direct the transaction to an error account that was in the name of an SCB branch bank. Although such an account should have been promptly identified with the actual counterparty, SCB intentionally left the account under the name of its branch bank to conceal the identity of the sanctioned party. This enabled SCB to process the transaction without having it blocked by the Federal Reserve Bank.

c) SCB designed its electronic trading system to contain an "always execute" function that enabled parties subject to U.S. sanctions to execute U.S. dollar trades without causing the transactions to be blocked by the Federal Reserve Bank.

d) It allowed parties subject to U.S. sanctions to gain access to its trading systems by voice and fax communications that resulted in having an SCB branch bank identified as the counterparty, thereby concealing the names of such sanctioned parties in order to evade blocking of U.S. dollar transactions by the Federal Reserve Bank.

**B.      The Plaintiffs Expose Defendants' Wrongdoing.**

39.      Plaintiff Knight served from 2009 to 2011 as SCB's Global Head of Transaction Banking Foreign Exchange. In that role, he discovered SCB's methods of evading U.S. sanctions. During 2010-2011, he made presentations about his discoveries of SCB's scheme to senior SCB management, including the Global Head Global Markets and the Global Head of Transaction Banking, for the purpose of proposing corrections that would end the utility of these methods as avenues by which to violate U.S. sanctions.

40.      In retaliation for his uncovering and disclosing SCB's illicit schemes, SCB terminated Plaintiff Knight on October 11, 2011.

41.      In late 2012, Mr. Knight and his colleague, Robert Marcellus, became aware that SCB was about to conclude settlements with Federal and New York State authorities for violations of the Iran sanctions during the 2001-2007 period based on SCB's false portrayal that those violations were far more limited, both in numbers of transactions and the nominal value of those transactions, than they in fact were.  Mr. Marcellus and Mr. Knight approached New York State and Federal authorities with significant evidence that they were being duped by SCB, but it was too late to halt those particular transactions.

42.      Upon the advice of the authorities and counsel, To conceal their identities, Mr. Marcellus and Mr. Knight formed Brutus Trading, LLC to file lawsuits against SCB in this Court under the Federal False Claims Act (December 2012) in order to conceal their identities. Meanwhile, both the New York State and the Federal authorities launched renewed investigations of SCB and its branches based on the information produced by Mr. Knight and Mr. Marcellus.

43.     Plaintiff Chandra served from 2011 to 2016 in SCB's Dubai branch bank as its local Head eCommerce client services. His role was divided among back office, middle office and front office functions of SCB. This enabled Plaintiff Chandra to have extensive access to the full range of SCB's transactional processes and records, including those of SCB's online trading systems.

44.     In July 2012, Plaintiff Chandra read media reports that Al Rajhi Bank of Saudi Arabia had funded terrorist activities, including those that resulted in deaths of former colleagues and other individuals in his native India. Realizing that Al Rajhi Bank was an SCB customer, he reported that fact to his superior.

45.     Later in 2012, Plaintiff Chandra read media reports that SCB had been fined for breaching U.S. sanctions, which prompted him to do a search of SCB trades with parties suspected of having ties to Iran. He discovered numerous suspicious parties with whom SCB had transacted business on its online system.

46.     Mr. Chandra became aware of the deliberate "flaws" in SCB's online trading systems that were designed to conceal transactions in U.S. dollars by SCB's customers who were subject to U.S. sanctions. He also learned of SCB's use of sundry and error accounts to evade U.S. sanctions for the benefit of sanctioned customers.

47.     Mr. Chandra concluded that the revenues derived from SCB's scheme to evade U.S. sanctions resulted in funds being made available to Iran-related parties and ultimately used to support terrorist activities that killed and wounded soldiers serving in the U.S.-led coalition, as well as many innocent civilians.

48.     In 2013, Mr. Chandra learned upon overhearing conversations of other SCB employees that SCB had targeted Mr. Knight for retaliation for reporting SCB's scheme to evade

U.S. sanctions. Mr. Chandra emailed Mr. Knight in April 2013 offering to provide information about SCB's scheme.

49.     Mr. Marcellus shared Mr. Chandra's May 2013 email to Mr. Knight with officials of the N.Y. Department of Financial Services and the U.S. Department of Justice.

50.     After consultation with federal and DFS officials, Mr. Marcellus arranged for a colleague residing in Dubai to contact Mr. Chandra for the purpose of determining whether Mr. Chandra was willing and able to provide information about SCB's scheme to evade U.S. sanctions. The Dubai colleague of Mr. Marcellus agreed to serve as an intermediary for that purpose and made initial contact with Mr. Chandra in Dubai by email on May 11, 2013.

51.     On May 18, 2013, Mr. Chandra informed the intermediary that a team from the U.S. had arrived in the SCB Dubai offices and was inspecting computer hard drives and other data storage in an apparent attempt to "clean" SCB records. He also handed the intermediary five computer files from SCB's Dubai branch, which contained information about SCB's transactions with parties suspected of connection to Iran. The intermediary transmitted those files electronically to Mr. Marcellus, who delivered them to the attorney for Brutus Trading, LLC. That attorney promptly provided them to the U.S. Department of Justice.

52.     A second delivery by Mr. Chandra of 75 SCB files to the intermediary occurred on September 17, 2013.

53.     On September 29, 2013, in accordance with instructions given directly to Mr. Chandra by FBI Special Agent Matthew Komar, Mr. Chandra hand-delivered three additional computer disks containing SCB files to the U.S. Consulate in Dubai.

C.     **Defendants' Retaliation Against the Plaintiffs.**

54.     The transactions with Iran-related parties during the relevant period for purposes of this case involved, at a minimum, tens of billions of U.S. dollars. Profit to SCB derived from those transactions during 2008-2014 amounted to approximately $750 million.

55.     Mr. Chandra provided the joint investigation with documents executed by SCB customers who were subject to U.S. sanctions, as well as tens of thousands of SCB documents memorializing actual SCB transactions on behalf of sanctioned parties.

**1. The Disclosure of Plaintiffs' Names**

56.     On September 26, 2013, during a telephone call with Agent Komar, Mr. Chandra learned that his identity had been disclosed to counsel for SCB by an individual associated with the joint investigation.

57.     Shortly after the disclosure of Mr. Chandra's involvement with the investigation, personnel in SCB Dubai branch thoroughly examined his computer system in what they stated was a random check for malware. There had been no such random computer checks in his experience with SCB. Such reviews and examinations had always been conducted on an across-the-board basis.

58.     During the investigations in early 2013, the meta-data on some of the files submitted by Mr. Knight was not completely removed by the FBI as Mr. Knight had been assured. During an interview with Hassan Jarrar of SCB Dubai, Mr. Knight's name became transparent to SCB's counsel and Mr. Jarrar from those files, who paused the interview. When it resumed, the interview focused on Mr. Knight. SCB counsel and Mr. Jarrar made unfounded, insulting and scurrilous comments about Mr. Knight to the investigators for the duration of the interview. Mr. Jarrar went so far as to claim Mr. Knight had an affair while working for SCB (a

fabrication drawing from the facts of an affair in which the Head of Global Markets had actually engaged). Mr. Jarrar closed by assuring the investigators that no one in the Middle East would ever hire Mr. Knight after his departure from SCB.

**2. The Retaliation Against Mr. Chandra**

59.     Mr. Chandra was subjected after the disclosure of his cooperation with the investigation to harassment, bullying and discriminatory treatment by SCB personnel, particularly Zeeshan Khan, his supervisor, and Steven Tong of SCB NY, to whom Mr. Chandra reported. Despite having received exemplary performance reviews in previous years, Mr. Chandra was given a highly negative performance review in March 2014 for the year 2013. He filed a formal grievance against Mr. Khan regarding that review and other discriminatory treatment. After senior management in the SCB Dubai branch realized that he was cooperating with the investigation, they reacted to him with noticeable hostility. Mr. Khan and Declan Clements took Mr. Chandra to aside to discuss the future of his team, suggesting that it might be shut down. This was an obvious attempt to pressure him to leave SCB.

60.     On October 27, 2014, Mr. Chandra received the first of three telephone calls threatening him for assisting the investigation, stating: "We know you helped the Americans. It's not good and we will take care of you." During the following days, he received two identical calls. These threatening calls and the hostile treatment that Mr. Chandra had been receiving caused him substantial emotional stress and sleeplessness.

61.     Mr. Khan's secretary advised him privately in March or April 2015 that Mr. Khan had been devising a pretext for some time to fire Mr. Chandra. She urged him to take care.

62.     In April 2015, SCB Dubai allowed Mr. Chandra to go to Nepal, which had experienced a devastating earthquake, to locate and assist his wife's relatives living in the

earthquake area. He undertook substantial efforts to help relieve suffering in remote areas that government and other relief agencies had not been able to reach. The SCB Nepal team nominated Mr. Chandra to receive the SCB Group Chairman's Award for his contributions to the relief effort. Mr. Chandra was given that award by then Group Chairman Sir John Peace in London in 2015.

63.     The Chairman's Award included a six-month mentorship by senior management. Sir John Peace stepped down from his position shortly after Mr. Chandra received his award. Mr. Chandra never received the six-month mentorship.

64.     While Mr. Chandra was in London, he was again warned by Mr. Khan's secretary, who had recently left Mr. Khan's team, that Mr. Khan continued to plan to fire him.

65.     The Group Chairman's Award made it difficult for SCB Dubai to fire Mr. Chandra immediately.

66.     On December 7, 2016, however, Mr. Chandra was advised that his position had been made redundant and that his employment would be terminated on April 8, 2017.

67.     SCB Dubai continued its discriminatory and retaliatory treatment of Mr. Chandra upon his termination. Contrary to the usual dealings with departing employees, SCB Dubai refused to give Mr. Chandra severance pay, removed all information about him from its records, refused to assume responsibility for the credit card expenses incurred by Mr. Chandra related to SCB business, and declined to relieve him of his financial obligation on his automobile lease, thus saddling Mr. Chandra with overwhelming debt that he has been unable to repay.

68.     On information and belief, SCB Dubai has continued to defame Mr. Chandra since his termination and made it impossible for him to obtain employment.

69.     Mr. Chandra continues to receive threatening telephone calls from the same telephone number.

70.     Mr. Chandra has experienced substantial economic injury, persistent stress and severe emotional pain as a direct consequence of the actions of Defendants. Damages for such injuries will be established at trial.

**3. The Retaliation Against Mr. Knight**

71.     Mr. Knight was pressured by Defendants without reasonable cause to leave SCB and his position as SCB's Global Head of Transaction Banking Foreign Exchange Sales after exposing SCB's scheme to violate the Iran sanctions. Once his name was disclosed to SCB as a whistleblower in March 2013, the Defendants launched a campaign using a network of current and former employees calculated to deprive Mr. Knight of any employment in the financial services industry and to harm him economically and emotionally by villifying his character and maligning his professional abilities. This campaign to destroy Mr. Knight's career has continued to the present day.

72.     For example, after Mr. Knight was forced out of SCB by the Defendants, he secured employment in the New York office of Société Générale, major international financial group based in France. In March 2012, Julio Rojas, the CEO of SCB NY, contacted the Head of Compliance at Société Générale New York to inform him that Mr. Knight was a whistleblower and not to be trusted. This resulted in intense scrutiny of Mr. Knight by the Compliance Department that humiliated him and made his continued work at Société Générale untenable, requiring him to leave that employment. Mr Knight was forced to resign in May 2013 after just one year in position and following twice weekly interrogative meetings with Compliance.

73.     Upon returning to the U.K., he was warned by participant in the joint investigation of SCB that Defendants had indicated an intention to cause Mr. Knight personal harm, causing him to engage security personnel to protect himself and his family for several months.

74.     In Oct 2014, Mr. Knight was hired by the hedge fund, Dynamic Capital Management UK Ltd. Mr. Knight worked as Global Head of Sales and Business Development until May 2018. In that position, Mr. Knight was the sole person in Dynamic Capital's UK office responsible for developing business. During that time, as part of the Defendants' blacklisting effort, James Hopkinson from SCB UK sought to disparage Mr. Knight to his contacts in the press so as to undermine his work at Dynamic Capital and make his conditions of employment there untenable.

75.     At Mr. Hopkinson's instigation, Simon Duke of the Sunday Times hounded Mr. Knight, going so far as to visit every property Mr. Knight owned in the UK since 1993, to follow Mr. Knight home, to repeatedly rifle through his trash, and to interrogate people who had worked for Mr. Knight, such as his gardener. Mr. Duke threatened to publish an article critical of Mr. Knight if he did not cooperate with him. Because dealing with investors was a central part of Mr. Knight's job, such an article would have been catastrophic for his career. Mr. Knight eventually did cooperate with Mr. Duke, who ultimately published an article that was not critical of Mr. Knight.

76.     In November 2016, Martin Arnold, Head of Banks at the Financial Times London called Mr. Knight. Mr. Arnold informed Mr. Knight that Mr. Hopkinson had called him and informed him that Mr. Knight was a whistleblower responsible for an article critical of SCB printed earlier that year containing information about the Iranian clients of SCB. Mr. Hopkinson

claimed that Mr. Knight's information was malicious and simply designed to harm SCB, and that

SCB would pursue Mr. Knight to prevent him speaking to the press again.

77.     Also in November 2016, Mr. Knight was approached by a former senior member

of SCB UK, Mr. David Bee. He was calling on the pretense that his new employer, Lloyds Bank,

wanted to manage some of the business of the Hedge Fund at which Mr. Knight then worked.

Mr. Bee was a former Global Head in Sales at SCB UK. He informed Mr. Knight that senior

SCB personnel, including Ken Reich, a Senior Managing Director in the Hedge Fund Team at

SCB UK, Peter Gibbinson, Head of Front Office Surveillance at SCB UK, and Richard Selby,

former Head of G10 Foreign Exchange at SCB UK, had made comments to him and other SCB

employees that Mr. Knight was dishonest and not to be trusted, and that he had deliberately

invented information to harm SCB.

78.     The stress of this campaign of harassment against Mr. Knight ultimately triggered

a neurocardiogenic condition from which he suffers, leading to over 30 seizures in 2017. This

impact on his health forced Mr. Knight to take medical leave from Dynamic Capital from March

2017 to March 2018. His absence was a profound blow to client development at Dynamic

Capital's UK office. The performance of the office plummeted and in May 2018 was closed, and

Mr. Knight was again out of a job.

79.     The extent of the Defendants' campaign against Mr. Knight was exposed again in

November 2017, when he met with Lawbrook Finance, a leading recruitment service for

accounting and finance functions in the financial services and corporate world. In a meeting with

Mr. Chris Gower, the CEO and Managing Partner of Lawbrook, and other Lawbrook personnel,

Mr. Knight was advised that Tracy Clarke, the Head of Human Resources as SCB UK, had been

telling the asset management and hedge fund community that Mr. Knight was a dishonest whistleblower, a trouble-maker, and a bad employee.

80.     This smearing campaign by SCB had a devastating effect on Mr. Knight's career. Between November 2017 and March 2018, he interviewed with three London hedge funds: Quadra Capital, Omni Partners, and QSI International. Mr. Knight had at least two interviews with each hedge fund on different days. Mr. Knight was offered no position at any of them. They gave feedback to Lawbrook, who reported to Mr. Knight that SCB had made disparaging statements to these hedge funds about Mr. Knight's character, which prevented each of them from considering Mr. Knight further.

81.     The loss of employment, the damage to his professional reputation, the expense of retaining security personnel, the emotional distress, and other economic and financial consequences of Defendants' retaliatory actions have resulted in injury to Mr. Knight. Damages for such injuries will be established at trial.

## CAUSES OF ACTION

### COUNT I
*Unlawful Retaliation Against Mr. Chandra in Violation*
*of the False Claims Act, 31 U.S.C. § 3730*

82.     The allegations in the foregoing paragraphs of this Complaint are incorporated here by reference.

83.     As set out above, in their Federal False Claims Act lawsuit, Messrs. Knight and Marcellus through Brutus Trading, LLC, have accused the Defendants adopting a scheme to conceal from the Government billions of dollars of clearing transactions in which they engaged from 2001 through 2014 in violation of applicable United States sanctions on Iran.

84.     Every transaction of the Defendants allegedly violating the Iran sanctions constitutes a violation of regulations and orders issued pursuant to § 206 of the International Emergency Economic Powers Act ("IEEPA"). 50 U.S.C. § 1705(a).

85.     Each transaction allegedly violating § 206 of IEEPA is a "specified unlawful activity," 18 U.S.C. § 1956(c)(7)(D), any proceeds from which are, "upon commission," forfeited by operation of law to the United States and all "right, title, and interest" in those proceeds vest immediately in the United States. 18 U.S.C. §§ 981(a)(1)(C), (a)(2)(C) & (f).

86.     Thus, when any clearing transaction in violation of the Iran sanctions occurs, the money involved in that transaction is automatically forfeit to the United States and creates a duty of the perpetrator to pay that sum to the United States.  That duty to pay is an established "obligation" to pay within the meaning of the False Claims Act. 31 U.S.C. § 3729(b)(3). With each transaction violating the Iran sanctions, the Defendants by operation of law assumed such an obligation.

87.     Pursuant to the Defendants' alleged scheme to conceal their violations of the Iran sanctions, the Defendants knowingly made, used, or caused to be made or used, a false statement material to an obligation to pay or transmit money or property to the United States in violation of the False Claims Act. 31 U.S.C. § 3729 (a)(1)(G).

88.     As described above, Mr. Chandra undertook lawful acts to provide evidence of these violations of the False Claims Act by the Defendants in furtherance of the qui tam action brought by Messrs. Knight and Marcellus through Brutus Trading, LLC, and to stop the Defendants' violations of the False Claims Act.

89.     The Defendants became aware that Mr. Chandra was engaging in these lawful acts.

90.     Because of these lawful acts, as set out above, Mr. Chandra was discharged and

discriminated against in the terms and conditions of his employment, and continues to be

threatened and harassed, all retaliatory actions in violation of the False Claims Act. 31 U.S.C. §

3730(h)(1).

91.     Accordingly, whether or not the Defendants are found to have violated the False

Claims Act, Mr. Chandra is entitled to the full scope of relief provided by the False Claims Act

for such retaliatory actions.  31 U.S.C. § 3730(h)(2).

### COUNT II
*Unlawful Retaliation Against Mr. Chandra and Mr. Knight in Violation*
*of the New York False Claims Act, N.Y. STATE FIN. § 191*

92.     The allegations in the foregoing paragraphs of this Complaint are incorporated

here by reference.

93.     One aspect of the Defendants' alleged scheme to conceal their U.S. dollar clearing

transactions in violation of the Iran sanctions was to not allocate the bank's revenues from those

transactions to SCB NY. As a result, the full extent of the assets and liabilities of SCB NY was

not disclosed to the proper authorities for the determination of the assessment due under N.Y.

Financial Services Law § 206 or of the tax due (at that time) under N.Y. Tax Law §§ 1450-1468.

These statutes create a legal obligation to pay an assessment or a franchise tax for "the privilege

of exercising its franchise or doing business in this state." N.Y. Tax Law § 1451(a). Thus this

obligation to pay an assessment or franchise tax becomes and established duty within the

meaning of the New York False Claims Act, N.Y. State Financial Law § 188(4), as soon as an

entity does business in New York, whether or not the precise amount to be paid is fixed at that

time.

94.     The New York False Claims Act is expressly applicable, in the context of this case, to statements made relating to liability under the tax law. N.Y. State Financial Law § 189(4)(a).

95.     Pursuant to the Defendants' scheme to conceal their violations of the Iran sanctions, which necessarily concealed the full extent of their tax obligations under New York law, the Defendants knowingly made, used, or caused to be made or used, a false statement material to an obligation to pay or transmit money or property to the state or local government in violation of the New York False Claims Act. N.Y. State Financial Law § 189(1)(g) & (h).

96.     As described above, Mr. Knight documented the mechanisms by which the Defendants implemented and concealed their violations of the Iran sanctions and brought them to the attention of officers and representatives of the Defendants.  Because of these lawful acts by Mr. Knight to stop Defendants' conduct, he was discharged from his employment in violation of the New York False Claims Act. N.Y. State Financial Law § 191(1).

97.     After his termination, and after the Defendants became aware that he was a key actor in a qui tam suit brought under the New York False Claims Act against them, Mr. Knight was harmed or penalized by the Defendants' deliberate course of conduct to threaten and harass him, and to deprive him of any future employment in the financial services industry, all in further violation of the New York False Claims Act. N.Y. State Financial Law § 191(1).

98.     As described above, Mr. Chandra undertook lawful acts to provide evidence of the Defendants' violations of the New York False Claims Act in furtherance of the qui tam action brought by Messrs. Knight and Marcellus through Brutus Trading, LLC, and to stop the Defendants' violations of the New York False Claims Act.

99.     The Defendants became aware that Mr. Chandra was engaging in these lawful acts.

100.    Because of these lawful acts, as set out above, Mr. Chandra was discharged and discriminated against in the terms and conditions of his employment, and continues to be threatened and harassed, and otherwise harmed or penalized by Defendants' deliberate course of conduct to deprive him of employment, all retaliatory actions in violation of the New York False Claims Act. N.Y. State Financial Law § 191(1).

101.    Accordingly, Mr. Knight and Mr. Chandra are entitled to the full scope of relief provided by the New York False Claims Act for such retaliatory actions regardless of whether the Defendants are found to have violated the New York False Claims Act.  N.Y. State Financial Law § 191(1)(a) – (e).

### PRAYER FOR RELIEF

Therefore, Mr. Chandra and Mr. Knight demand judgment against Defendants for the following relief:

a)     an award to each of the Plaintiffs of two times the amount of their back pay;

b)     an award of interest on their back pay to each of the Plaintiffs;

c)     compensation to each of the Plaintiffs for the special damages they have sustained as a result of the Defendants' retaliation against them;

d)     an injunction restraining continued retaliation against the Plaintiffs by the Defendants or their agents;

e)     an award of all costs of this action, including attorneys' fees and expenses; and

f)      an award such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to FED. R. CIV. P. 38, Relator demands trial by jury of any and all issues

in this action so triable by right.

Dated:          New York, New York
                December 23, 2019

                                        Respectfully submitted,

                                        ANSHUMAN CHANDRA
                                        JULIAN M. KNIGHT,
                                        *Plaintiffs*

                                        By:      /s/Patrick M. McSweeney

Patrick M. McSweeney
McSweeney, Cynkar & Kachouroff, PLLC
3358 John Tree Hill Road
Powhatan, VA 23139
(804) 937-0895
patrick@mck-lawyers.com
(Pro Hac Vice Motion to be submitted)

Robert J. Cynkar
McSweeney, Cynkar & Kachouroff, PLLC
10506 Milkweed Drive
Great Falls, VA 22066
(703) 621-3300
rcynkar@mck-lawyers.com
(Pro Hac Vice Motion to be submitted)

                                        *Attorneys for Plaintiffs*