UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

                              Plaintiff,                    Case No. 18 Civ. 11117 (PAE)

      v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVIICES
CORPORATION,

                              Defendants.

-------------------------------------------------------------x

### DECLARATION OF JULIAN M. KNIGHT

JULIAN M. KNIGHT, pursuant to 28 U.S.C. § 1746, declares as follows subject to the penalties of perjury:

#### I. BACKGROUND AND PROFESSIONAL EXPERIENCE

1.    I am a principal of relator Brutus Trading, LLC ("Brutus"), and I make this declaration in support of Brutus's motion to vacate the judgment in the above-captioned matter on the grounds that it resulted from a demonstrable fraud on the Court. The statements included in this declaration are based on my own personal knowledge of global banking and foreign exchange trading and Iranian-related terror financing.

2.    In 2011, I left Standard Chartered Bank ("SCB") in my position as Global Head of Transaction Banking FX (foreign exchange). I was a Global Manager based in the DIFC (Dubai International Finance Center) Branch in the UAE (number 1 DIFC, Dubai UAE). I regularly worked out of my second office at 1 Marina Bay Financial Centre in Singapore.

3. I have over 30 years of experience in Banking and Finance following a career in the UK Military. I have lived and worked in the following financial centers for major Global Banks and Hedge Funds: London UK; New York USA; Singapore; and Dubai UAE. In my career I have been Global Head of FX at Fimat International Banque for 8 years, Global Head of FX at Man Group PLC, Global Head of Agency FX Trading at Societe Generale in NY. I am currently resident in the UK.

4. In the UK Military I was positively vetted by the UK Ministry of Defense and held clearance authority to levels of Flash and Top Secret. In the UK, I currently hold the highest clearance level of criminal record check, which was performed by the Church of England for my role as a Senior Safeguarding Officer to extremely vulnerable people.

5. On July 16, 2023, I was introduced to David Scantling by a mutual colleague. We were at the time working to assist in instructing of the families of UK and US military victims of Iranian sponsored terrorism – particularly in the Middle East – about the notable linkages in the flow of money between the Iranian regime and banks. We of course focused on my former employer, Standard Chartered Bank.

## II. DECLOAKING SCB DATA FILES

6. On July 16, 2023 I began to upload a large amount of data onto a specialized database known as Logikcull. The data were divided into a range of different file types. At that time, I communicated with Mr. Scantling regarding those data files ("Files").

7. The reorganization of our data allowed us to run unique searches in the form of hit reports on the entire data set. The "Hit reports" were related to known Iran Republican Guard Corps. ("IRGC") super facilitator entities – entities that control the network required to move illicit funds around the world, such as Khatam- Al- Anbia. The IRGC has been designated by the US government as a foreign terrorist organization ("FTO") since 2019.

8. When the Hit reports were completed, Mr. Scantling, my colleague Mr. Robert Marcellus and I began closely examining the "Hits" and the Files from which they were retrieved. This led us to understand that many pieces of data were "cloaked" within the Files, *i.e.,* embedded in the electronic spreadsheets and concealed from view. This phenomenon was pertinent to Excel files.[1]

9. At this stage, our focus changed to decloaking the Files that we had initially analyzed. By July 19, 2023, we had decloaked our first range of Excel spreadsheets, including the Files that had been provided to the US government entitled FX Revenues for Cash and Trade Corporates FINAL 22 July 2010, MENA Customerwise Jan2009, and MENA Apr to Dec 2012.

10. The initial exercise with Mr. Scantling was completed by July 25, 2023. Our interaction with Mr. Scantling continued on October 24, 2023, when we began focusing on Files we had previously analyzed related to Mr. Reza Zarrab, a former Standard Chartered Bank client and a known affiliate of the IRGC.

11. The further work of decloaking the Files continued on November 13, 2023. By December 19, 2023, Mr. Scantling had decloaked approximately 50 Files and we began to re-order our data into a more convenient database known as Airtable. This work continued at a steady pace through late December 2023 and early January 2024.

12. By February 2024, we had isolated over 500,000 unique transactional records spanning from 2008 through 2013. To date, I have identified at least 20,000 unique FX transactions involving USD vs FX transactions between SCB Dubai/SCB NY and Iranian-related[2] clients.

---

[1] At that time, neither Mr. Marcellus nor I was familiar with the more sophisticated features of the Excel program. Although a limited number of pivot tables containing data were evident on the program's surface interface, we were not aware of or able to access data caches underlying numerous levels of pivot tables that were embedded in the Excel spreadsheet. It was therefore not until Mr. Scantling instructed us on how to access those data files in July 2023 that we first became aware of the cloaked data.

[2] For the purposes of this declaration, "Iranian-related" is defined as *beneficially owned by Iran or Iranian persons and trading from or with Iran.*

Those transactions comprise approximately **$100 Billion** in notional value.[3] They also include transactions with as Specially Designated Nationals ("SDNs"), Specially Designated Global Terrorists ("SDGTs"), and the financiers of major FTOs.

### III. EXPERT ANALYSIS OF THE NEWLY EXTRACTED DATA

13. I have spent over 5 months analyzing the newly extracted data from the following files:

    a. "Cash and Trade Corporates Client Groups FX Revenues_6 Sep 2010_MENA_V1.xlsx"
    b. "Performance Summary -Iran(SNPC)[numbered 1–12 and 14–50]['.xls' or '.xlsx' file extension]"; (49 Excel spreadsheets)
    c. "Sundry.xlsx";
    d. "MENA April to Dec 2012.xlsx";
    e. "GCS MENA 2012-01-01 30.xls";
    f. "GIS MENA 2010-05-01.xls";
    g. "depos 19th august showing difference.xlsx";
    h. "TB clients min 10k.xlsx"
    i. "Dubai_pos_limits_extern_credit_chk29"

14. Those transactions occurred between 2008 and 2013.

15. They are typical FX Transactions for Spot value (2 days settlement after transaction) or Forward value or Eurodollar deposits (USD deposits made from overseas entities for a term duration).

16. Both financial instruments utilize the US Fedwire system for settlement. Both instruments require SWIFT MT 300 series messages (transaction forms used by the SWIFT funds transfer system). SWIFT Category 3 FIN messages (electronic interbank messages used by the

---

[3] I understand that Mr. David Scantling has identified an Excel file pivot table (which was visible to the U.S. Government) that documents $9,669,290 U.S. dollars in profit from SCB's 2012 Iran-related revenue. Underlying that pivot table, Scantling found a hidden data cache containing 32,950 foreign exchange transactional records with an aggregate notional value of $84,062,156,991.71 U.S. dollars. *See* Declaration of David J. Scantling, dated May 20, 2024, at Addendum ¶¶ 94, 188. That sum is a portion of the $100 Billion of Iranian-related transactions that I have identified for the period 2008 to 2012

SWIFT system) enabled SCB to efficiently confirm, settle, and manage various treasury transactions. That has been the mechanism for confirmation of FX Transactions since the late 1990's. As a former Global Head of FX, I am very familiar with that process. To the best of my knowledge, in the previous US government investigations into SCB, SWIFT Category 3 FIN messages (MT 300 type) have never been analyzed.

17. SCB's Iranian-related clients fall into 3 categories: SDNs; clients coded by SCB as included in the bank's Iran Group business division, and SCB clients that are beneficially owned by Iranian individuals or an Iranian company (directly or indirectly), irrespective of whether they were specifically included on OFAC's list of SDNs ("SDN List").

18. There were 92 illegal FX transactions with then-known SDNs – namely: Iran Aseman; IFIC Holding AG; the Central Bank of Iran (Bank Markazi); Bank Tejerat; and the Petrochemical Commercial Company (UK and Dubai branches).

19. In addition to those explicit SDN transactions, there were 73 illegal transactions for Euro African Group Limited, a Gambian front company for the FTO Hezbollah. There were also transactions in 2009 for TAJCO, a previously designated SGDT that is also owned by Hezbollah.

20. There were 2,500 FX transactions with SCB "Iran Group" coded entities – namely: Dalahoo Engineering and Manufacturing Company ("DEMCO"); Iran Industrial Exchange Company; Darman Yab Omid Company LTD; Oil Industries Engineering and Construction; Parsian High Voltage Substations Development Company; Parsian International Establishment and Petropars Ltd.

21. There were 6,300 FX transactions with Iranian-related clients - namely: Amesco (1456 transactions); Crescent Petroleum (332 transactions); Petrochem Mid East (460 transactions); Petrofac Ltd (3324 transactions); and Al Masood Oil ISS Co (613 transactions).

22. There were over 1000 FX transactions for Rosy Blue Diamonds/Trading, which is a known Hamas front company (1055 transactions).

23. This subset of Iranian-related transactions involving the following front companies wholly owned by SDNs: FAL Oil (300 transactions); Dragon Oil (644 transactions) (both front companies for National Iranian Oil Company NIOC); and Diamonds Steel (front for Alborz Steel).

24. Of the 20,000 newly extracted transactions, a large percentage (approximately 65%) were done via OLT3, the SCB Online Trading System. Those transactions occurred *in or after 2008*.

25. SCB earned jaw-dropping commissions for many of the cloaked transactions. For example, in 2009 and 2010, SCB completed approximately $16,659,285 in EUR vs. USA FX transactions for the Euro African Group Limited deals and earned $504,881 in commissions for doing so. The total commission that SCB typically would have charged corporate clients for similar FX transactions would have been approximately $825. That sort of extreme profiteering is known as "gouging," and is commonplace in bank transactions involving known terrorist organizations.

\* \* \* \* \* \*

Executed on May 20th, 2024, in Lincolnshire. UK

_____
Julian M. Knight